**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MASSACHUSETTS**

| | |
|---|---|
| KHADIJAH HAJJAJ and CHANDEL WHITE, on behalf of herself and all others similarly situated,<br><br>         Plaintiffs,<br><br>v.<br><br>RENTGROW, INC., DBA YARDI RESIDENT SCREENING,<br><br>         Defendant. | Case No.  1:17-cv-10076-PBS<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br>**(JURY TRIAL DEMANDED)** |

Plaintiffs Khadijah Hajjaj and Chandel White, by and through their attorneys, on behalf of themselves and the Class set forth below, brings the following First Amended Class Action Complaint against RentGrow, Inc., d/b/a/ Yardi Resident Screening ("Yardi" or "Defendant").

## INTRODUCTION

1.     This consumer class action is brought under the Fair Credit Reporting Act, 15 U.S.C. § 1681, *et seq*. ("FCRA") against a screening company who routinely violates the FCRA's basic protections by failing to follow reasonable procedures to ensure that the tax lien data it reports is accurate.   Plaintiffs also bring an individual action pursuant to California law.

## THE PARTIES

2.     Plaintiff Khadijah Hajjaj is an individual person and a resident of Los Angeles, California.

3.     Plaintiff Chandel White is an individual person and a resident of Los Angeles, California.

4.     Plaintiffs White and Hajjaj are married.

5.     Defendant RentGrow, Inc., d/b/a/ Yardi Resident Screening is a Delaware corporation with its principal office located at 307 Waverly Oaks Road, Suite 301, Waltham, Massachusetts.

6.     Defendant is a consumer reporting agency as defined by the FCRA, and provides background reports regarding potential tenants to landlords.   *See* http://www.yardi.com/products/yardi-resident-screening/.

## JURISDICTION AND VENUE

7.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 1681p.

8.     Venue is proper in this District pursuant to 28 U.S.C. § 1391(b).  Defendant resides and is headquartered in this District.

## STATUTORY BACKGROUND

9.     Enacted in 1970, the FCRA's passage was driven in part by two related concerns: first, that consumer reports were playing a central role in people's lives at crucial moments, such as when they applied for housing.  Second, despite their importance, consumer reports were unregulated and had widespread errors and inaccuracies.

10.     While recognizing that consumer reports play an important role in the economy, Congress wanted consumer reports to be "fair and equitable to the consumer" and to ensure "the confidentiality, accuracy, relevancy, and proper utilization" of consumer reports.  15 U.S.C. § 1681.

11.     15 U.S.C. § 1681e(b) requires consumer reporting agencies to follow reasonable procedures to ensure the maximum possible accuracy of the information they report.  As discussed below, Defendant routinely violates the FCRA by failing to follow reasonable

2

procedures to ensure the maximum possible accuracy of the information it reports. This lack of reasonable procedures causes Defendant to routinely report outdated public records information. In Plaintiffs' case, Defendant's failed procedure — failing to check the current status of the record at the source — caused Defendant to report a satisfied and paid tax lien as outstanding and unpaid.

## ALLEGATIONS RELATING TO PLAINTIFFS

12.     Plaintiff Hajjaj is a Chief Petty Officer in the United States Navy.  Her current principal duty involves enlisting new naval recruits.  In that role, Plaintiff has been stationed at a number of locations across the country.

13.     In 2015, Plaintiff Hajjaj was stationed in South Carolina and, with her husband, Plaintiff White, and children, was renting a house there.  Towards the end of 2015, Plaintiff Hajjaj's orders were that she was going to be transferred to a new location near Las Vegas, Nevada.

14.     During this time, Plaintiffs were not legal residents of South Carolina; members of the military do not change their legal residency when they are deployed to another state. Plaintiffs were then and remain legal residents of California.

15.     However, when Plaintiffs were in South Carolina, a tax preparer erroneously filed a return with the state of South Carolina for the tax year 2014.  This lead to a $335.95 tax lien erroneously being assessed against Plaintiffs.  See Exhibit 1.

16.     Rather than spend the time and resources to dispute this erroneous lien, Plaintiffs paid the lien in full on March 18, 2016.  *Id.*

17.     In October 2015, Plaintiffs discovered that their infant daughter was gravely ill with a brain tumor and Posterior Fossa Syndrome, both of which required urgent medical attention.  Because of this, Plaintiff Hajjaj's transfer to Las Vegas was indefinitely suspended.

18.     In June of 2016, on their daughter's doctor's recommendation, Plaintiff Hajjaj was transferred to the Los Angeles area, so that her daughter could have access to specialists in her condition at the Children's Hospital Los Angeles.

19.     When moving to Los Angeles, it was important to Plaintiffs to find new housing quickly, for all of the reasons that any family moving to a new city would want to find housing quickly, but also because acquiring a permanent address was a critical step in acquiring referrals to specialists that were needed to care for their daughter.

20.     In June 2016, Plaintiffs, working with Waypoint Homes, a property management company, found an ideal home.  Not only was it near to the children's hospital, but it also had an open floor plan, which would accommodate her daughter's gait trainer — a wheeled device which assists her in walking — as well as a swimming pool which would assist in her physical therapy.  Plaintiffs sought to rent the home.

21.     Waypoint Homes, in considering Plaintiffs' application, purchased two "resident screening reports" from Defendant, one on each Plaintiff.  These reports are attached as Exhibit 2 and 3.

22.     Defendant sells "resident screening reports" to landlords and property management companies.  These reports are "consumer reports" as defined by the FCRA.  See Ex. 2 at 9 (acknowledging that the report is governed by the FCRA).

23.     Defendant's "resident screening reports" include information aggregated from a number of different sources, and also include scoring and recommended actions — called

"results" — generated by Defendant.  See Ex. 2 at 9 ("the data obtained by [Defendant] is maintained, updated and furnished to [Defendant] by third-parties including public agencies, vendors and the three major credit bureaus."[1]

24.     Defendant's report on Plaintiff Hajjaj, issued June 13, 2016, recommended that Waypoint "decline" Plaintiff's application due to "severe level of Judgment(s) or Suit(s)."  Ex. 2 at 1.

25.     Defendant's report assesses "points," both positive and negative, based on Plaintiff's history.  *Id*.  Plaintiff's report contained numerous positive entries, and three entries assigned a negative value.  *Id*.  Those three negative entries totaled a negative 42 points, 35 of which were attributable to the South Carolina tax lien.  *Id*. at 8.

26.     Defendant's reporting of the South Carolina tax lien was the reason Defendant recommended that Waypoint decline Plaintiff Hajjaj's rental application.

27.     Defendant's report on Plaintiff White, issued June 16, 2016, recommended that Waypoint "decline" Plaintiff White's application due to "severe level of Judgment(s) or Suit(s)" and because "Criminal History Does Not Meet Property Requirements."  Ex. 3 at 1.

28.     The only negative piece of credit information on Plaintiff White's report was the South Carolina tax lien, which, as on Plaintiff Hajjaj's report, accounted for negative 35 points.

29.     The only piece of criminal information on Plaintiff White's report was a South Carolina proceeding for misdemeanor violation of a court order of protection, listed on the report as "pending."  Ex 3 at 4.

---

[1] Even if Defendant is reselling data it obtains from other CRAs, it has an independent obligation to comply with the FCRA.  *Henderson v. Corelogic Nat'l Background Data, LLC*, 161 F. Supp. 3d 389, 395 (E.D. Va. 2016).

30.     None of the derogatory information on either report — the criminal information on Plaintiff White's report, and the tax lien information on both Plaintiffs' reports — was accurate.

31.     Defendant's reporting of the criminal charge on Plaintiff White's report was inaccurate.  In fact, the misdemeanor charge was not pending, it had been dismissed.

32.     Pursuant to South Carolina law, charges of this type that do not result in a conviction are automatically expunged.  S.C. Code § 17-22-950.  For that reason, no results return if the case number included on Defendant's report is searched in the Lexington County, South Carolina, courts' online site.  See Ex 4.

33.     Rather than access the online court records, Defendant relied on an out-of-date database, which resulted in it mis-reporting Plaintiff White's criminal record.

34.     Further, Defendant's reporting of the South Carolina tax lien on both Plaintiffs' reports was inaccurate.  Defendant reported the tax lien as unpaid, when, in fact, at the time of the report it had been paid in full for nearly three months.

35.     Defendant never consulted the original South Carolina records to determine the current status of the lien, even though those records were readily available and would have shown that the lien had been paid.

36.     In fact, the relevant tax lien information was available online on a website operated by the State of South Carolina.  See Ex. 5.  That online record indicated that the lien had been satisfied, and the record had been updated on line as of March 18, 2016.  If Defendant had done a simple online search, it would have avoided incorrectly reporting the lien as unpaid.

37.     Instead, Defendant purchased the tax lien information at issue from Experian. Experian has been sued a number of times for reporting out-of-date tax lien information, so

Defendant was on notice that the information was unreliable.  See *Clark v. Experian Info. Sols.*, *Inc.*, 3:16-cv-23 (E.D. Va. Jan. 2016); *Camarata v. Experian Info. Sols., Inc.*, 1:16-cv-00132 (S.D.N.Y. Jan. 2016).

38.     Further, Experian had explicitly told Defendant not to rely on the information Experian provided, and had disclaimed any responsibility for the accuracy or currency of that information.

39.     When Experian agrees to provide information to entities such as Defendant, it requires those entities to sign a contract containing the a provision which is materially identical to the following:

> THE [LICENSED DATA] IS PROVIDED ON AN "AS IS" AND "AS AVAILABLE" BASIS.  [LICENSEE] AND ITS DATA PROVIDERS MAKE NO REPRESENTATIONS OR WARRANTIES, EXPRESS OR IMPLIED, WITH RESPECT TO THE [LICENSED DATA] AND DISCLAIM ANY EXPRESS OR IMPLIED WARRANTIES WITH RESPECT THERETO. WITHOUT LIMITING THE FOREGOING, [LICENSEE] AND ITS DATA PROVIDERS DO NOT GUARANTEE OR WARRANT THE ACCURACY, TIMELINESS, COMPLETENESS, CURRENTNESS, MERCHANTABILITY, NON-INFRINGEMENT, OR FITNESS FOR A PARTICULAR PURPOSE OF THE [LICENSED DATA].

40.     Defendant signed an agreement with Experian containing the term in Paragraph 30 above, or similar language.   Given this disclaimer, it was manifestly unreasonable for Defendant to rely on Experian's data.

41.     When Experian agrees to provide information to a Consumer Reporting Agency entity such as Defendant, it requires those entities to sign a contract containing the following provision:

> Licensee hereby certifies that it is an originating "consumer reporting agency" as defined by the FCRA and that it shall comply with the FCRA, the Federal Trade Commission and Consumer Financial Protection Bureau interpretations thereof, and similar state statutes.   Without limiting the foregoing, Licensee shall be responsible for (i) maintaining reasonable procedures to assure the maximum

possible accuracy of the information concerning the individual to whom any consumer report relates

42.     Defendant signed an agreement with Experian containing the term in Paragraph 32 above, or similar language.  Defendant was therefore on notice of its FCRA responsibilities, and had contractually agreed that those responsibilities were its own, not Experian's.

43.     Regulators have consistently found that large consumer reporting agencies have systemic data reliability problems.  The Consumer Financial Protection Bureau ("CFPB") has noted precisely that, in reports ranging from 2015 to 2017.  See CFPB Supervisory Highlights, Summer 2015 at 5 (available at http://files.consumerfinance.gov/f/201506_cfpb_supervisory-highlights.pdf) (finding that CRAs "lacked formal programs to oversee and manage data supplied by furnishers" as well as "systematic or consistent policies and procedures to provide feedback to furnishers regarding the quality of the data furnished" and specifically finding that CRAs' handling of public record information was "weak and required corrective action. For example, one or more CRAs had never conducted a formal audit of their public records providers. In addition, one or more CRAs did not have defined processes to verify the accuracy of public record information provided by their public records providers"); CFPB Supervisory Highlights     Consumer     Reporting     Special     Edition,     Winter     2017     at     4 (files.consumerfinance.gov/f/documents/201703_cfpb_Supervisory-Highlights-Consumer-Reporting-Special-Edition.pdf) (noting that CRAs' "data governance functions were decentralized and had undefined responsibilities. They lacked quality control policies and procedures to test compiled consumer reports for accuracy, had inconsistent practices for vetting furnishers and providing data quality feedback to them, and had insufficient monitoring and oversight of furnishers once approved to provide data").

44.     No regulatory body, including the CFPB, has found that public records data from Experian or any of the "big three" CRAs is particularly reliable, or that reliance upon their public records data relieves a reseller CRA of its own duties under the FCRA.

45.     Not only was Defendant on notice that the data it received from Experian was unreliable, Defendant also purchases data from two other major consumer reporting agencies, Transunion and Equifax. Yet, those two other agencies did not report the tax lien to Yardi.

46.     Defendant's misreporting of the South Carolina criminal records and the South Carolina tax lien were the reasons Waypoint declined Plaintiffs' rental application.

47.     Because of Defendant's inaccurate reporting, Plaintiffs faced several weeks of delays before securing housing for themselves and their family.  During that time, the entire family lived in a single room with extended family, their daughter was unable to get the referrals to the care she urgently needed, and the family's clothing and belongings could not be delivered from South Carolina.

48.     Further, when Plaintiffs actually secured housing, it was less ideal than the house Waypoint refused to rent them based on Defendant's flawed reporting.  It was less accessible to her daughter's gait trainer, did not have a pool for use with physical therapy, is less convenient to the children's hospital, and, unlike the home Plaintiffs originally sought, it did not come equipped with a refrigerator, causing Plaintiffs to have to purchase one out-of-pocket.

49.     The denial of housing caused by Defendant's flawed reporting also caused Plaintiffs to suffer emotional distress, stress in Plaintiffs' relationship, difficulty sleeping, and difficulty adapting to Plaintiff Hajjaj's new deployment.

## CLASS ALLEGATIONS

50.     Plaintiffs assert Count I on behalf of the Lien Class defined as follows:

All natural persons with an address in the United States and its Territories: (i) who had a tax lien recorded; (ii) whose tax lien appeared on one of Defendant's consumer reports at any time from January 17, 2015 and continuing through the resolution of this case; and (iii) whose tax lien had been paid, satisfied, or released on a date prior to the date of the consumer report.

51.     Plaintiffs assert Count II on behalf of the Expungement Class defined as follows:

All natural persons with an address in the United States and its Territories: (i) whose criminal record appeared in one of Defendant's consumer reports at any time from January 17, 2015 and continuing through the resolution of this case; and (ii) whose criminal record had been expunged on a date prior to the date of the consumer report.

52.     Numerosity:  The Classes are so numerous that joinder of all class members is impracticable.  Defendant produces reports to landlords nationwide, and has produced thousands of reports on prospective tenants during the class period, many of whom are members of the Class.

53.     Typicality:  Plaintiffs' claims are typical of the class members' claims.  Defendant treated Plaintiffs in the same manner as other class members.

54.     Adequacy:  Plaintiffs will fairly and adequately protect the interests of the Class, and have retained counsel experienced in complex class action litigation.

55.     Commonality:  Common questions of law and fact exist as to all members of the Classes and predominate over any questions solely affecting individual members of the Classes. These common questions include:

a.   Whether Defendant willfully violated the FCRA by reporting tax liens which were actually paid;

b.   Whether Defendant willfully violated the FCRA by failing to follow reasonable procedures to assure the maximum possible accuracy of the tax lien information it reported;

     c.   The proper measure of statutory and punitive damages; and

     d.   The proper form of declaratory relief.

56.     Class certification is appropriate under Fed. Civ. P. R. 23(b) because questions of law and fact common to the Classes predominate over any questions affecting only individual members of the Classes, and because a class action is superior to other available methods for the fair and efficient adjudication of this litigation.  Defendant's conduct described in this Complaint stems from common and uniform policies and practices, resulting in common violations of the FCRA.  Members of the Classes do not have an interest in pursuing separate actions against Defendant, as the amount of each class member's individual claim is small compared to the expense and burden of individual prosecution, and Plaintiffs are unaware of any similar claims brought against Defendant by any members of the Classes on an individual basis.  Class certification also will obviate the need for unduly duplicative litigation that might result in inconsistent judgments concerning Defendant's practices.  Moreover, management of this action as a class action will not present any likely difficulties.  In the interests of justice and judicial efficiency, it would be desirable to concentrate the litigation of all class members' claims in a single forum.

**COUNT I**
**15 U.S.C. § 1681e(b)**
***Failure to Follow Reasonable Procedures***
***On Behalf of Plaintiffs and the Lien Class***

57.     Plaintiffs incorporate the paragraphs above.

58.     Defendant failed to comply with 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the tax lien information in the consumer reports it prepared regarding Plaintiffs and the other class members.

59.     The foregoing violations were negligent.

60. The foregoing violations were willful.

61. Defendant acted in negligent, deliberate and reckless disregard of its obligations and the rights of Plaintiffs and class members under 15 U.S.C. § 1681e(b). Defendant's negligent and willful conduct is reflected by, *inter alia*, the following:

  a. Defendant received the tax lien information at issue from Experian. Experian has been sued a number of times for reporting out-of-date lien and public records information, so Defendant was on notice that the information was unreliable. See *Clark v. Experian Info. Sols.*, Inc., 3:16-cv-23 (E.D. Va. Jan. 2016); *Camarata v. Experian Info. Sols., Inc.*, 1:16-cv-00132 (S.D.N.Y. Jan. 2016);

  b. Defendant was specifically advised not to rely on the data it purchased from Experian, and was informed that Experian did not warrant that the data was accurate or complete;

  c. The CFPB and other agencies had issued public warnings about the lack of procedures in place at Experian, Equifax and Transunion to ensure the accuracy of public records information;

  d. Even though the CFPB cautions against relying on any of the three national consumer reporting agencies' public records data, Defendant reported the lien as unpaid despite not receiving any information from Transunion or Equifax confirming the data it had received from Experian;

  e. Despite pending litigation against Experian about tax lien reporting, an explicit warning from Experian that the data was not warranted as complete and up to date, warnings from the CFPB about relying on Experian for public records data, and the total lack of any data from any other consumer reporting agency confirming Experian's report, Defendant took no action whatsoever to update or verify the lien information it received from Experian;

  f. Defendant could have easily updated the data by simply accessing a publicly available website;

  g. Defendant never consulted the original South Carolina records to determine the current status of the lien, even though those records were readily available and would have shown that the lien had been paid;

  h. The FCRA was enacted in 1970; Defendant has had over 40 years to become compliant;

  i. Defendant's conduct is inconsistent with the FTC's longstanding regulatory guidance, judicial interpretation, and the plain language of the statute;

  j. Defendant knew or had reason to know that Defendant's conduct violated the FCRA;

  k. Defendant knowingly benefitted from its unlawful conduct by relying on third-party data providers, and avoiding the expense of verifying that the information it reported was accurate; and

l.   By adopting such a policy, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

62.    Plaintiffs and the class members are entitled to actual and statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. §§ 1681n(a)(1)(A), 1681o.  Plaintiffs and the class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2).  Plaintiffs and the class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3) and 1681o(a)(2).

### COUNT II
### 15 U.S.C. § 1681e(b)
### *Failure to Follow Reasonable Procedures*
### *On Behalf of Plaintiff White and the Expungement Class*

63.    Plaintiffs incorporate the paragraphs above.

64.    Defendant failed to comply with 15 U.S.C. § 1681e(b) by failing to follow reasonable procedures to assure maximum possible accuracy of the criminal record information in the consumer reports it prepared regarding Plaintiff White and the other class members.

65.    The foregoing violations were negligent.

66.    The foregoing violations were willful.

67.    Defendant acted in negligent, deliberate and reckless disregard of its obligations and the rights of Plaintiff and class members under 15 U.S.C. § 1681e(b).  Defendant's negligent and willful conduct is reflected by, *inter alia*, the following:

a.   Defendant received the criminal record information from a third party, and failed to take any steps whatsoever to verify its accuracy and currentness before reporting it;
b.   Defendant could have easily updated the data by simply accessing a publicly available website;
c.   Defendant never consulted the original South Carolina records to determine the current status of the criminal proceedings;

13

    d.  The FCRA was enacted in 1970; Defendant has had over 40 years to become compliant;

    e.  Defendant's conduct is inconsistent with the FTC's longstanding regulatory guidance, judicial interpretation, and the plain language of the statute;

    f.  Defendant knew or had reason to know that Defendant's conduct violated the FCRA;

    g.  Defendant knowingly benefitted from its unlawful conduct by relying on third-party data providers and avoiding the expense of verifying that the information it reported was accurate; and

    h.  By adopting such a policy, Defendant voluntarily ran a risk of violating the law substantially greater than the risk associated with a reading that was merely careless.

68.    Plaintiff and the class members are entitled to actual and statutory damages of not less than $100 and not more than $1,000 for each and every one of these violations, pursuant to 15 U.S.C. §§ 1681n(a)(1)(A), 1681o. Plaintiff and the class members are also entitled to punitive damages for these violations, pursuant to 15 U.S.C. § 1681n(a)(2). Plaintiff and the class members are further entitled to recover their costs and attorneys' fees, pursuant to 15 U.S.C. § 1681n(a)(3) and 1681o(a)(2).

## COUNT III
### Cal. Civ. Code § 1786.20(b)
### *Failure to Follow Reasonable Procedures*
### *On Behalf of Plaintiffs*

69.    Plaintiffs incorporate the paragraphs above.

70.    Defendant is an "investigative consumer reporting agency" and the report attached as Ex. 2 is an "investigative consumer report," both as defined by Cal. Civ. Code § 1786.2.

71.    Pursuant to Cal. Civ. Code § 1786.20(b), Defendant was required to follow reasonable procedures to ensure the maximum possible accuracy of the contents of the report.

72.    For the reasons listed above, Defendant failed to meet that obligation.

73.     Pursuant to Cal. Civ. Code § 1786.50(a)(1) Defendant is liable to Plaintiffs in the amount of $10,000 or actual damages, whichever is greater, as well as attorneys' fees and costs.

74.     Because Defendant's violation was willful, as noted above, Defendant is also liable to Plaintiffs for punitive damages.  Cal. Civ. Code § 1786.50(b).

## PRAYER FOR RELIEF

75.     WHEREFORE, Plaintiffs, on behalf of themselves and the Class, pray for relief as follows:

a. Determining that this action may proceed as a class action under Fed. R. Civ. P. 23(b);
b. Designating Plaintiffs as class representatives and designating Plaintiffs' counsel as counsel for the Class;
c. Issuing proper notice to the Classes at Defendant's expense;
d. Declaring that Defendant violated the FCRA;
e. Declaring that Defendant acted willfully, in knowing or reckless disregard of Plaintiffs' rights and its obligations under the FCRA;
f. Awarding actual, statutory and punitive damages as provided by the FCRA;
g. Awarding reasonable attorneys' fees and costs as provided by the FCRA;
h. Declaring that Defendant violated Cal. Civ. Code § 1786.20(b);
i. Awarding actual statutory and punitive damages and attorneys' fees and costs as provided for by Cal. Civ. Code § 1786.50; and
j. Granting other and further relief, in law or equity, as this Court may deem appropriate and just.

## DEMAND FOR JURY TRIAL

76.     Plaintiffs and the Class demand a trial by jury.

Respectfully submitted,

BERGER & MONTAGUE, P.C.

Dated:  April 3, 2017

*/s/ E. Michelle Drake*
E. Michelle Drake, MN Bar No. 0387366
Joseph C. Hashmall, MN Bar No. 0392610
43 S.E. Main Street, Suite 505
Minneapolis, MN 55414
Telephone:  (612) 594-5999
Facsimile:  (612) 584-4470

emdrake@bm.net
jhashmall@bm.net

LICHTEN & LISS-RIORDAN, P.C.
Harold L. Lichten, MA Bar No. 549689
729 Boylston Street, Suite 2000
Boston, MA 02116
Telephone:  (617) 994-5800
hlichten@llrlaw.com

FRANCIS & MAILMAN, P.C.
James A. Francis, PA Bar No. 77474
Land Title Bldg., 19th Floor
100 South Broad Street
Philadelphia, PA 19110
Telephone:  (215) 735-8600
Facsimile:  (215) 940-8000
jfrancis@consumerlawfirm.com

**CERTIFICATE OF SERVICE**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF), and paper copies will be sent to those indicated as non-registered participants on April 3, 2017.

*/s/ E. Michelle Drake*
E. Michelle Drake